**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CURTIS TREY SEASTRUNK,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DARWELL INTEGRATED** | § | |
| **TECHNOLOGY, INC.,** | § | |
| | § | |
| **Defendant/Counter-Plaintiff,** | § | |
| | § | |
| **DTS INTERNATIONAL INC., d/b/a** | § | |
| **DARWELL TECHNOLOGY SYSTEMS,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | **Civil Action No. 3:05-CV-0531-BF(G)** |
| | § | **ECF** |
| **DARWELL INTEGRATED** | § | |
| **TECHNOLOGY, INC.,** | § | |
| | § | |
| **Third Party Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CURTIS TREY SEASTRUNK and** | § | |
| **SITE MONITORING SOLUTIONS,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Plaintiff, Curtis Trey

Seastrunk ("Seastrunk") brought this action against Defendant, Darwell Integrated Technology, Inc.

("DIT") for copyright infringement. DIT alleges the following third party plaintiff claims against

Seastrunk and his company, Site Monitoring Solutions, Inc. ("SMS"): (1) copyright infringement,

1

(2) tortious interference with existing contracts, (3) civil conspiracy, and (4) unfair competition. In addition to these third party plaintiff claims against Seastrunk, DIT also alleges the following counter claims: (1) breach of fiduciary duty, (2) violation of the Texas Theft Liability Act, and (3) trade secret misappropriation. Seastrunk and DIT seeks injunctive relief, damages, and attorney fees as a result of their respective claims.

The Court conducted a bench trial, commencing on February 25, 2008. For the reasons that follow, the Court finds that DIT is entitled to judgment on Seastrunk's claims and Seastrunk and SMS are entitled to judgment on DIT's claims and counter claims. Accordingly, Seastrunk and DIT shall take nothing by way of their causes of action.

## FINDINGS OF FACT

### I.

Seastrunk asserts that DIT infringed Seastrunk's copyrights in computer code, referred to as the "Liebert Protocol Converter" ("Converter") and the "Protocol Board Addressing Decode" ("Decode") (collectively the "Code"). The Converter is a computer code that monitors Liebert brand air conditioners. In order to monitor the Liebert brand air conditioners, the Converter asks pieces of equipment questions in a structured form and translates the data it receives in response into a language other equipment will understand. This allows users to find out when errors occur and to determine problems with the equipment. The Liebert brand air conditioners run on hardware known as protocol converter boards. The Decode manages the memory of these protocol converter boards.

There are three entities involved in this case. While all have similar names, they are separate entities. The first is DIT, the defendant in this suit. DIT was founded in December 2003 by Shelia Darisse and started business on January 1, 2004. Seastrunk was employed by DIT from early

January 2004 until mid-July 2004. The second entity is Darwell Technology Systems ("DTS"). DTS was founded by Roger Darisse, Shelia Darisse's husband, in 1997. DTS filed for bankruptcy on January 21, 2004. Prior to his employment with DIT, Seastrunk was an employee of DTS. The final entity is non-party Darwell Technologies, Inc. ("DTI"). Roger Darisse started this company in 1989. Seastrunk was never an employee of DTI.

In the early 1990s, DTI hired Daniel Fuhrmann ("Fuhrmann") to develop various computer codes, including the Converter and Decode. On August 8, 2004, Seastrunk purchased the copyright to the Converter and the Decode from Fuhrmann. Seastrunk and Fuhrmann's Agreement for Assignment of Copyright was amended ("Amended Agreement") on August 17, 2005. As clarified in the Amended Agreement, Seastrunk purchased ownership of the Converter and the Decode and all rights to assert any past, present, and future claims for infringement of the works. On September 20, 2004, Seastrunk registered the copyright for the Converter. The copyright for the Decode was registered on January 13, 2005. Seastrunk brought this suit against DIT for infringing his copyrights in the Converter and the Decode. Fuhrmann admitted that portions of the computer code that he sold to Seastrunk were not his to sell and were sold by mistake

The Code was developed in 1990 and 1991 for Darwell Technologies, Inc. ("DTI"). Roger Darisse formed DTI in 1987, and hired Fuhrmann to create varies computer codes for his products. Fuhrmann would submit invoices to Roger Darisse for work done on the computer codes, and Roger Darisse would pay him for his work. In addition to the Converter and the Decode, Fuhrmann created other computer code for DTI, but did not claim ownership to all of these works. For example, Fuhrmann created parts of the SitePro technology, but never claimed to have ownership of that code. Fuhrmann admitted that he did not have ownership in any computer code created for DTI beyond

what was contained in a written royalty agreement. The royalty agreement, however, was for a code not at issue in this case. Additionally, while writing the computer codes for the Converter and the Decode, Fuhrmann indicated within the codes that DTI was an owner of the work. Fuhrmann developed computer codes for DTI until 2001. During this time Fuhrmann never objected to DTI or Roger Darisse modifying the computer code Fuhrmann wrote, including the Converter and Decode.

Both Seastrunk and DIT agree that Fuhrmann was an independent contractor and not an employee. No evidence was presented suggesting otherwise. There was no written agreement between DTI and Fuhrmann indicating that DTI owned, or had an interest in, the Code's copyright. Roger Darisse also admits that he did not participate in the actual creation of parts of the Code. He only paid for the development of the Code. As a result, the Court finds that DIT failed to show that Fuhrmann did not have the right to sell Seastrunk the Code.

Even though Fuhrmann had the right to sell the Code, the Court finds that Seastrunk has not presented either direct or indirect evidence demonstrating that DIT copied the Code or that there is a substantial similarity between DIT's code and the Converter and Decode. DIT makes several products that communicate with the Liebert air conditioner. There is no direct or indirect evidence that these products contain the Code. In March 2006, after Seastrunk's employment with DIT ended, he was contacted by Comcast. Comcast informed him that it was having problems with its monitoring system and asked Seastrunk to come look at the Comcast network. When Seastrunk went to Comcast, he noticed that it was using DIT equipment. However, because Seastrunk was hired by Comcast to check the Comcast network, he did not access the firmware inside the DIT equipment. As a result, he never saw what computer code was being used in the DIT equipment.

Viewing DIT equipment, but not viewing the computer code being used in that equipment does not provide evidence that DIT was using the Converter or Decode. Accordingly, The Court finds that there is no direct evidence that DIT ever used the Code in its equipment.

In addition to alleging that DIT directly copied the Converter and Decode without authorization, Seastrunk also argues that DIT used DTS products, which copied the Converter and Decode without authorization. Seastrunk testified that while employed by DTS, Seastrunk was aware of the computer code that Fuhrmann created for DTI. Seastrunk stated that he helped Fuhrmann with the code when Fuhrmann encountered problems with equipment. Seastrunk testified that after Fuhrmann left in 2001, Seastrunk continued working with the Fuhrmann code at DTS and installed it on five sites for DTS customers. There is no evidence as to whether Seastrunk personally installed the Code or if he simply installed products that used the Code. If the latter, the evidence does not show which products he installed at these sites, or how he knew that those products contained the Code. The Court finds that Seastrunk is not a credible witness and that his statements regarding direct copying by DIT and DTS are not credible.

Kevin Kennedy, an employee of DTS, also testified that while working at DTS, in 2001, he developed the MiCore product for DTS. He stated that he put some of the Liebert code into the MiCore product so that it could communicate with the Liebert air conditioner. Kennedy was under the impression that the Liebert code was the same as the Fuhrmann code; however, he did not know which pieces of Fuhrmann code he used. The Court does not find Kennedy to be a credible witness. Moreover, Seastrunk does not claim that DIT's MiCore product infringes his copyright. As a result, the Court finds that there is not sufficient direct evidence that DTS copied the Converter and the Decode.

Morever, even if the Code was installed in DTS products while Seastrunk worked there, there is no evidence that the Code was still contained in these products when DIT began to use them. The technology in the equipment that these products monitor changes on a regular basis. This requires the computer code in the monitoring products to also change on a regular basis. Therefore, even if DTS has at some point used the Code, the evidence does not show that any of that Code was still in DTS products at the time DIT began using the products. Accordingly, DIT's use of DTS's products cannot be used to show copying by DIT.

Likewise, indirect evidence does not show that DIT copied the Converter or Decode. Seastrunk failed to present any indirect evidence showing that DIT copied the Decode. Seastrunk's expert, Steve Widom ("Widom"), never compared DIT's code with Seastrunk's Decode. Without direct or indirect evidence, the Court finds that Seastrunk failed to show that DIT copied the Decode.

Seastrunk did offer indirect evidence that DIT copied the Converter; however, the Court finds that this evidence was not credible. Widom conducted a side by side comparison of DIT's code with all of Seastrunk's code, which included the Converter. After analyzing these codes, Widom found that there was a substantial similarity between the two codes and that DIT copied Seastrunk's code. Seastrunk, however, did not provide Widom with only the protected Converter code. Instead, Seatrunk gave Widom all of Seastrunk's registered and non registered works, even though the non registered works are not at issue in this case. After providing Widom with this code, Seastrunk never told Widom to focus only on the Converter, or only the Converter and Decode. Widom had no knowledge as to which pieces of code were at issue and which were not when conducting his analysis. His conclusion was, therefore, based on a comparison of all the code Seastrunk gave him with DIT's code. This resulted in Widom finding substantial similarity between

Seastrunk's non registered code, which is not at issue in this case, and DIT's code. After learning that he had based much of his expert report on pieces of Seastrunk's code that were not at issue in this case, Widom admitted that he could not tell who copied who. The Court finds that because Widom based his opinion that the two codes were substantially similar on portions of Seastrunk's code not at issue in this case, his ultimate conclusion that the codes are substantially similar is not credible.

Additionally, during the trial, it became clear that some of the examples Widom used to reach his conclusions about DIT's code and the Converter were dictated by industry standards. Upon cross-examination, Widom admitted that he was unaware of the industry standards. DIT's rebuttal expert, Professor Judy Etchison ("Etchison"), pointed out several instances where Widom found substantial similarity that were actually standard in the industry or dictated by third party hardware. For example, Widom found the Liebert.H files to be substantially similar based on several lines at the top that are the same. Etchison found that these lines are hardware dependant. Moreover, because a .H file usually defines standard things that will be seen elsewhere, it is not surprising that both Liebert.C files contain the Liebert.H files. Therefore, the similar portions of the Liebert.H files inside the Liebert.C files are hardware dependant. The Court finds Etchison to be a credible witness. Widom also states that DIT's code includes a section in the ParaBlock array, where the original code is commented out and replaced by new code. This is a common practice when modifying computer code. However, as Etchison points out and Widom admits, the original code that was commented out was not found anywhere in Seastrunk's code. Therefore, the commented-out code came from an earlier verison of DIT code and was later modified by DIT. It does not show substantial similarity or copying by DIT.

Etchison also disagreed with the method Widom used to determine who copied who. Widom stated that when copying another code, the copying party would make the "names" more specific. Widom concluded that because DIT's "names" were more detailed, it showed that DIT copied Seastrunk. Etchison contradicted Widom's assertion, stating that a copying party would make the "names" less redundant. Etchison also points to pieces of Seastrunk's code that is more detailed than DIT's code, indicating that even if Widom's reasoning was followed, it is not clear which code was copied.

The Court determines Etchison's expert opinion is credible and finds that Widom, in forming his opinion, relied on code not at issue in finding similarities, disregarded hardware requirements, disregarded industry standards, and relied on criteria not generally accepted in the computer industry. Accordingly, the Court finds that a side by side comparison of Seastrunk's Converter and DIT's computer codes failed to show that they were substantially similar.

Seastrunk also relies on the testimony of Fuhrmann as indirect evidence of copying. Fuhrmann testified that after comparing DIT's code and Seastrunk's code, he recognized portions of his code in DIT's code. Fuhrmann is not qualified to give an expert opinion in this case. He only reviewed the two codes for a short period of time prior to giving his testimony. He is not qualified to give an opinion as to whether the two codes are substantially similar. As discussed above, the independent experts could not find substantial similarity. Moreover, the portions that Fuhrmann did find similar, were portions that he uses in all his codes. Fuhrmann admits that he was hired to create other works for DTI and does not claim ownership to those works. Seastrunk did not prove that DIT took those pieces from Seastrunk's code. The Court finds that DIT likely used those pieces from other computer code created by Fuhrmann for DIT. The Court find that Fuhrmann is not a credible

witness. Accordingly, the Court affords no weight to Fuhrmann's testimony.

Seastrunk failed to present sufficient direct evidence that DIT copied the Converter or the Decode. No indirect evidence was presented relating to the Decode. Instead, the indirect evidence presented by Seastrunk related to the Converter. However, the testimony of Fuhrmann and Widom fail to prove that DIT copied the Converter. Moreover, this same evidence is relied upon to show substantial similarity. However, after hearing the testimony of the expert witnesses, the Court determines that the two code are not substantially similar.

## II.

DIT, as third party plaintiff, alleges that Seastrunk and SMS committed copyright infringement, tortious interference with existing contracts, civil conspiracy, and unfair competition. In addition to these third party plaintiff claims, DIT also alleges that Seastrunk breached his fiduciary duty to DIT, violated the Texas Theft Liability Act, and misappropriated trade secrets in its counter claims. DIT's claims and counter claims against Seastrunk and SMS stem from allegations that Seastrunk contacted DIT vendors and stole DIT property in order to start his own business that competes with DIT.

Prior to DTS filing for bankruptcy, its employees became concerned about the future of the company. John Sisser ("Sisser"), an employee of DTS, met with Kennedy and Seastrunk to discuss what they would do if DTS had to file for bankruptcy. There was some discussion that they would form their own company. As a result of this discussion, Seastrunk reserved the domain name www.knowit-tech.com, so the company, Know-It-Technology ("KIT") could be created quickly if DTS declared bankruptcy. Although the website was created, the corporation was never formed and the website was never used. Seastrunk and his wife formed their current company, SMS, after

Seastrunk's employment with DIT ended.

Seastrunk did not personally contact any DIT vendors about the possibility of supplying him with products for a new company that would compete with DIT. Instead, DIT claims that Sisser contacted DIT vendors on behalf of KIT. As stated above, there is no evidence that KIT was ever created. KIT was only discussed as a back up plan in the event that DTS declared bankruptcy. Dan Pierce, who worked at Radio, Inc., and was one of DTS and later DIT's vendors, testified that Sisser inquired about a line of credit in 2004. Pierce stated that Sisser told him that Seastrunk, Kennedy, and himself were looking into the possibility of starting a business due to financial problems with DIT. This testimony supports the Seastrunk's claim that the website for KIT was never created with the intention of forming a competing business to DTS or DIT. Sisser was gathering information in the event that DIT incurred financial difficulties, similar to his previous employer, DTS.

Even if Sisser was attempting to create a competing business with DTS or DIT, there is no indication that Seastrunk ever knew about Sisser's intention. Sisser admits to using a DIT cut sheet and contacting a potential DIT customer about a custom application for water detection. However, Sisser first spoke with Roger Darisse to determine if DIT wanted to make the custom water detection product for that customer and was told that DIT was not interested. Sisser's contact with this customer was based on investigating the potential market for custom water detection products in the event that DIT experienced financial problems. There is no indiction that Seastrunk ever knew about Sisser's use of DIT's cut sheet or Sisser's correspondence with this customer.

Sisser also contacted Dimitri Stein ("Stein"), a customer and vendor of DTS and later DIT, about attending a meeting with Seastrunk, Sisser, and Kennedy. Sisser told Stein that the purpose of the meeting was to discuss their "breaking away" from DIT. While Sisser used the vague term

"breaking away," the evidence does not show that Kennedy or Seastrunk ever intended to "break away" and form a competing company. Rather the evidence suggests that Kennedy and Seastrunk intended this meeting's purpose to be what they would do in the event that they no longer had jobs due to financial problems with DTS. While the evidence shows that Sisser used his KIT e-mail address and contacted several of DIT's costumers and vendors, there is no indication that Seastrunk had any knowledge of these actions or that he condoned them. The Court finds that Sisser's actions were taking independently, and not on behalf of Seastrunk or KIT.

On the day that Sisser was fired from DIT, he met with Cindy Klein ("Klein"), who worked for Texas Circuitry, Inc. At first, Klein believed that Sisser was there to pick up some of DIT's original artwork that Texas Circuitry had in its possession. While speaking with Klein, Sisser informed her that he had been fired from DIT. Upon learning this, Klein told Sisser that given the circumstances, it would be best for him not to take the DIT products. Sisser agreed and left without any DIT products. Sisser was upset about his employment with DIT being terminated. While his intention was to steal DIT products, he changed his mind and did not take the products. This action stemmed from his termination, and was taken independently. Seastrunk had no knowledge of Sisser's intention, and Sisser's actions were not taken on behalf of KIT.

There is also not sufficient evidence that Seastrunk personally stole property from DIT prior to the end of his employment. Shelia and Roger Darisse testified that after Seastrunk's employment with DIT ended, they noticed missing items. They stated that they believe that Seastrunk stole these items; however, they admitted that their belief was based on speculation and not on any personal knowledge. The Court finds that Shelia and Roger Darisse are not credible witnesses. DIT also introduced at trial surveillance video from Friday, July 16, 2004, Seastrunk's last day of work. The

video shows an unrecognizable person walking in and out of the DIT building over about a four minute time span. Shelia Darisse testified that the person on the surveillance video had to be Seastrunk because he was the only person still working at DIT when she left work. The Court finds her testimony to be pure speculation.

However, even if the Court accepts that it was Seastrunk on the video, it is not apparent from the video what, if anything, is being removed from the building. Seastrunk testified that he removed some personal items from the building that night, including a personal computer and a personal refrigerator. Shelia Darisse testified that she wrote a list of missing items on or about July 27, 2004. There is no evidence that DIT routinely inventoried its property in the office area. There is also not sufficient evidence connecting the items on the list to Seastrunk. Two other employees were recently fired, both of whom had that same access to these items. Moreover, as stated above, none of these items can been seen on the surveillance video being removed on July 16, 2004. Accordingly, the Court finds that the evidence does not show, or support an inference, that Seastrunk stole DIT software, products, and other items.

## CONCLUSIONS OF LAW

The Court has jurisdiction over Seastrunk and DIT's copyright infringement claims pursuant to 28 U.S.C. § 1338(a) (2006), and has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) (2006).

## I.

In order to prevail on a claim for copyright infringement, the plaintiff must prove (1) ownership of a valid copyright and (2) "actionable copying, which is the copying of constituent elements of the work that are copyrightable." *Bridgmon v. Array Systems Corp.*, 325 F.3d 572, 576

(5th Cir. 2003); *see also Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). In order to determine if actionable copying has occurred, the Court must make two separate inquiries. *Bridgmon*, 325 F.3d at 567. The first is "whether the alleged infringer copied, or actually used the copyrighted material in his own work." *Id.* This may be proven by direct or indirect evidence. Direct evidence has been defined as "[e]vidence, which if believed, proves existence of fact in issue without inference or presumption." Black's Law Dictionary 460 (6th ed. 1990). Because direct evidence of copying is not often available, "factual copying may be inferred from (1) proof that defendant had access to copyrighted work prior to creation of infringing work and (2) probative similarity." *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001). If a plaintiff demonstrates factual copying, the second inquiry as to whether actionable copying has occurred is "whether 'substantial similarity' exists between the copyrighted work and the allegedly infringing work." *Bridgmon*, 325 F.3d at 567. To determine if there is substantial similarity between the two works, "a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Peel & Co.*, 238 F.3d at 394; *Bridgmon*, 352 F.3d at 567.

In *Bridgmon*, the plaintiff argued that he did not need to produce evidence of substantial similarity between the protected software and the allegedly infringing software because he had evidence of direct copying. *Bridgmon*, 352 F.3d at 577. The Fifth Circuit, in *Bridgmon*, noted that the law of this Circuit prohibits a finding of copyright infringement without a side-by-side comparison of the two works. *Id.* The Fifth Circuit distinguished "probative similarity" from "substantial similarity." *Id.* at 577 n. 8. "Probative similarity" is the test used to determine factual copying when relying on indirect evidence. *Id.* "Substantial similarity" is the second prong of the

test used to determine actionable copying. *Id.* Therefore, in the Fifth Circuit, a plaintiff must produce evidence of substantial similarity between the two protected works even when it intends to prove that defendant did in fact copy the protected work through direct evidence. *Id.*

### A. Seastrunk's Copyright Infringement Claim Against DIT

A copyright registration serves as prima facie proof that the holder is the owner of the copyright. *See* 17 U.S.C. § 410(c) 2006. The burden is on the challenging party to prove that the ownership is not valid. Seastrunk and Fuhrmann executed a valid agreement of assignment for the Code, and Seastrunk subsequently registered the copyright for the Converter and Decode. Fuhrmann was hired to create the Code for DTI. A work for hire is "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101 (2006). The parties agree that Fuhrmann was hired as an independent contractor. No evidence was presented, which indicated that he was in fact an employee. While it appears to have been the practice of the parties to only execute a written agreement when the copyright was to be owned by Fuhrmann, § 101 clearly states that when an independent contractor is hired, he retains ownership unless there is a written agreement to the contrary. There is no written agreement specifying that DTI is the rightful owner of the copyright. As a result, the Court concludes that Fuhrmann was the owner of the copyright.

Likewise, DIT has not demonstrated that DTI or Roger Darisse were joint authors of the Converter or the Decode. To be joint authors the work must be prepared "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17

U.S.C. § 101 (2006). While the parties may have intended to have joint authorship, though even this is unclear, the evidence does not demonstrate that DTI or Roger Darisse worked independently on the Code. Roger Darisse admitted that he did not create any portions of the Code. He only paid to have the Converter and the Decode completed. While the evidence suggests that there may have been another author that helped Fuhrmann create the Code, there is no evidence whether he was an employee or an independent contractor. There is also no evidence as to which portions of the Code he created. Therefore, DIT has not proven that DTI or Roger Darisse were joint owners of the Code.

The Court, however, need not consider affirmative defenses because Seastrunk has failed to present sufficient evidence that DIT copied "constituent elements of the work that are copyrightable." As stated above, this requires two inquiries: whether DIT actually used the Converter and the Decode in its own work, and whether the DIT's code is substantially similar to the Converter and the Decode. Seastrunk has not presented evidence of either. First, Seastrunk has not proven that DIT actually used the Code in its own work. Seastrunk offered both direct and indirect evidence. As direct evidence, both Seastrunk and Kennedy testified that DIT copied the Code. Seastrunk testified that he personally witnessed infringement by DIT when he did work for Comcast after leaving DIT. However, Seastrunk only noticed that Comcast was using DIT equipment. He did not access the firmware inside the equipment and never saw whether or not the equipment was using the Code. Seastrunk also claims that DIT used DTS products, which contained the Code. Kennedy testified that he put the Liebert code into DTS's Micore product, and Seastrunk stated that he installed DTS equipment, that supposedly contained the Code, for customers on five sites. There is not sufficient evidence that Kennedy actually used the Converter or the Decode, or that the equipment Seastrunk installed actually contained the Code. Moreover, even if DTS at some

point used the Converter or Decode, there is no indication that the products still used that Code when DIT began using the products. The evidence shows that the code used in the products changes on a regular basis to remain current with the equipment that it monitors. Therefore, Seastrunk has failed to present sufficient direct evidence that DIT copied the Converter or Decode.

Likewise, indirect evidence does not show actual copying. As stated above, when using indirect evidence to show actual copying, the plaintiff must prove "that defendant had access to copyrighted work prior to creating the infringing work and . . . probative similarity." *Peel & Co.*, 238 F.3d at 394. While DIT arguably had access to the Converter and Decode because DIT used products that were once used by DTS, Seastrunk has failed to show probative similarity between the two works. Seastrunk relies on the testimony of Fuhrmann to show probative similarity. Fuhrmann is not qualified as an expert in this case. While he did not witness DIT using the Code, he states that he recognizes portions of his code in DIT's code. Fuhrmann states that the reason he knows that portions of DIT's code used his code is because he uses those portions in all of his codes. Fuhrmann admits that DTI hired him to create various other codes, to which he does not claim ownership. Therefore, the Court finds that DIT could have obtained these portions from other codes that it had authority to use. This evidence is not sufficient to show probative similarity.

In addition to Fuhrmann's testimony, Seastrunk relies on his expert's opinion that DIT's and Seastrunk's codes are "virtually identical," as indirect evidence demonstrating probative similarity. While probative similarity and substantial similarity are distinct tests that should be analyzed separately, the same evidence can be used to satisfy both tests. *Bridgmon*, 325 F.3d at 577 n. 8. As discussed above, Widom's opinion of substantial similarity is not credible. First, Widom never analyzed the Decode or compared it with DIT's code. Second, Seastrunk provided Widom with all

of his registered and non registered works. Therefore, in conducting his analysis and arriving at the conclusion that the two codes were "virtually identical," Widom utilized code not at issue in this case. Moreover, Widom was not familiar with industry standards and certain hardware dependant files. Finally, DIT's expert questioned the method Widom used for determining who copied who. Etchison credibly testified that Widom relied on criteria not generally accepted in the computer industry. This evidence fails to show probative similarity between the Converter and DIT's code. Accordingly, Seastrunk has not proven by a preponderance of the evidence that DIT engaged in factual copying.

In addition, Seastrunk has failed to prove the second inquiry of actionable copying, that the two codes are substantially similar. To demonstrate substantial similarity a side by side comparison of the two codes must be conducted. In order to prove substantial similarity, Seastrunk again relies on the opinion of his expert. Both Widom and Etchison conducted a side by side comparison. The Court finds that Widom's opinion was not credible, and Etchison's opinion was credible. For the reasons stated above, the Court finds that Seastrunk has failed to prove that the two codes are substantially similar.

The Court finds that Seastrunk has not presented adequate evidence to prove by a preponderance of the evidence that any infringement occurred. Seastrunk and his witnesses were not credible. The Court finds that Seastrunk has not proven that he is entitled to any damages or that there were any infringing actions by DIT. Therefore, Seastrunk is not entitled to injunctive relief to prohibit defendant from further use of the code in its possession. Moreover, Seastrunk is not entitled to damages or attorney fees.

**B. DIT's Copyright Infringement Claim Against Seastrunk and SMS**

DIT alleges that Seastrunk and SMS infringed DIT's copyrights in computer codes referred to as the Micore Modular Intelligent Protocol Interface ("Micore") and the Communication Interface for Liebert AC Unit using RS422 ("LCI"), which are registered with the United States Copyright Office. DIT has also failed to present sufficient evidence that Seastrunk copied constituent elements of the work that are copyrightable. There is no evidence that Seastrunk actually copied DIT's Micore and LCI products, or that Seastrunk's work is substantially similar to DIT's work. DIT attempted to prove actual copying by Seastrunk and SMS through direct evidence, and did not present any indirect evidence of infringement. DIT claims that Seastrunk stole DIT products, including Micore and LCI, and that his company, SMS, is currently selling the Micore product under the name "Coyote." As discussed above, there is no evidence that Seastrunk stole any products from DIT. Shelia and Roger Darisse only speculated that Seastrunk stole items from DIT, and admitted that they do not have any personal knowledge that Seastrunk stole DIT property. Seastrunk admits that the Coyote competes with Micore, but denies that it uses any Micore code. While Seastrunk admits that the description of the Coyote product on the SMS website is similar to the description of the Micore product,[1] the fact that both products have similar purposes does not prove that the Coyote is the same as the Micore product or that it uses DIT's protected code.

Even if DIT had presented direct evidence of actual copying, it still failed to produce evidence of a substantial similarity between the copyrighted code and the code used by Seastrunk. *See Bridgmon*, 325 F.3d at 577. DIT's expert, Etchison, did not analyze the computer code known

---

1. The SMS website, in describing a product similar to Micore, lists the name of that product as EI. Seastrunk testified that the term EI was a placeholder for a yet to be named product. This product was later named Coyote. Accordingly, the Court refers to the product by its name Coyote, rather than the placeholder EI used in the product description on the website.

as Micore.  DIT did not present its protected code at trial, and did not satisfy the requirement that the protected and infringing code be compared side-by-side.  *See General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 146 (5th Cir. 2004) (noting that the software developer failed to present evidence supporting its claims of copyright infringement without providing its own code for a side-by-side comparison).

As a result, DIT has not proven by a preponderance of the evidence that Seastrunk or SMS infringed DIT's Micore or LCI products.  Therefore, DIT is not entitled to injunctive relief to prohibit Seastrunk from further use of the code in its possession.   DIT is also not entitled to damages or attorney fees.

## II.

DIT alleges that Seastrunk, with Kennedy and Sisser, formed and operated a competing business while still employed by DIT.  DIT also claims that Seastrunk, Kennedy, and Sisser contacted DIT vendors and customers in an attempt to lure them away from DIT and use their new business.  Because of these actions, DIT alleges that Seastrunk and SMS were part of a civil conspiracy and tortiously interfered with existing DIT contracts.  Moreover, DIT claims that in forming this competing company, Seastrunk breached his fiduciary duty to DIT.

### A.  Civil Conspiracy

A civil conspiracy is, "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means."  *Carrol v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979).  To prove a civil conspiracy claim, there must be "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."  *Massey v.*

*Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Once civil conspiracy is established liability extends "beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." *Carroll*, 592 S.W.3d at 925–26 (quoting W. Prosser, Handbook of the Law of Torts 46, at 293 (1971)). Once a conspiracy has been proven, all co-conspirators are responsible for any acts taken by any other conspirator in furtherance of the unlawful act. *Id.* (citing *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)). "Under Texas law, civil conspiracy is a derivative tort." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007). If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails. *Id. See also Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("[D]efendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.").

Seastrunk, Kennedy, and Sisser met one time to discuss what would happen if their employer filed for bankruptcy. They decided that they would start their own business. They never discussed leaving DTS or DIT, and they never discussed setting up a business that would compete with DTS or DIT. This is collaborated by Pierce who testified that Sisser had inquired about a line of credit because he was concerned about his employer's financial situation. Accordingly, there was no unlawful objective, and there was no meeting of the minds as to how they would proceed with an unlawful objective. While Seastrunk set up a website for KIT after meeting with Kennedy and Sisser, the evidence demonstrates that this was done in case their employer declared bankruptcy, and they were left without a job. KIT never became an operating business, and there was no agreement by Seastrunk, Kennedy, and Sisser to use KIT to compete with DTS or DIT. There is also no indication KIT was ever absorbed by SMS. KIT and SMS are separate, unrelated entities.

Accordingly, DIT failed to show that Seastrunk or SMS were involved in a civil conspiracy with Kennedy and Sisser. As a result, unlawful actions, if any, taken by Kennedy or Sisser cannot be attributed to Seastrunk or SMS.

**B. Tortious Interference with Existing DIT Contracts**

Because Seastrunk cannot be liable for actions taken by Kennedy or Sisser, Seastrunk cannot be liable for tortious interference with existing DIT contracts. Under Texas law "tortious interference with an existing contract consists of: (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995). DIT seeks to hold Seastrunk liable for tortious interference with existing DIT contracts based on Sisser's actions of contacting DIT costumers and venders. Most of Sisser's contact with DIT costumers and vendors appears to have been done with the intention of making inquiries incase DTS or DIT experienced financial trouble. However, even if Sisser was attempting to contact DIT customers and vendors with the intention of persuading them to work with him instead of DIT, Seastrunk cannot be held liable for Sisser's actions. As stated above, Seastrunk did not agree to compete with DIT, or take customers or venders from DIT. Sisser testified that Seastrunk had no knowledge of Sisser's actions. There is also no indication that Sisser was acting on behalf of SMS. SMS was not yet formed at the time Sisser was contacting DIT vendors and customers. While Sisser stated several times that he was acting on behalf of KIT, the evidence shows that KIT was never formed and there is no indication that KIT ever became SMS. As a result, there was no willful or intentional act of interference by Seastrunk or SMS. Accordingly, DIT failed to prove that Seastrunk and SMS tortiously interfered with existing DIT contracts.

### C. Fiduciary Duty

DIT also alleges that Seastrunk, as an employee, breached his fiduciary duty to DIT. In order to establish that Seastrunk breached his fiduciary duty, DIT must prove (1) the existence of a fiduciary duty between Seastrunk and DIT; (2) that Seastrunk breached that duty, and; (3) that Seastrunk's breach caused injury to DIT. *Abetter Trucking Co. V. Arizpe*, 113 S.W.3d 503, 508 (Tex. App. - Houston 2003). When a fiduciary relationship exists between an employee and employer, the employee must act for the benefit of the employer in matter connected to the business. *Id.* at 510. DIT argues that Seastrunk breached his fiduciary duty of loyalty, to act in good faith, to refrain from self-dealing, to full disclosure, to act with integrity, and of candor. These allegations stem from DIT's believe that Seastrunk set up a competing business and did not inform DIT of its existence or of its competitive nature. While as an employee of DIT, Seastrunk did have a fiduciary duty to DIT, there is no evidence that Seastrunk breached that duty. As stated above, the KIT website was only set up so that a new company could be formed quickly if DTS or DIT experienced financial problems. KIT was never formed. It was not until after his employment with DIT that he formed SMS. Therefore, the Court finds that DIT failed to prove by a preponderance of evidence that Seastrunk breach his fiduciary duty to DIT.

### III.

In addition to claiming that Seastrunk conspired with Kennedy and Sisser to form a competing business with DIT, DIT also claims that Seastrunk stole DIT property and used that property at SMS. Accordingly, DIT claims that Seastrunk and SMS are liable for unfair competition. DIT also alleges that Seastrunk violated the Texas Theft Liability Act, misappropriated trade secrets, and is liable for conversion of DIT property.

## A.  Unfair Competition

"The law of unfair competition is the umbrella for all statutory and nonstatutory causes of cation arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. V. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974).  Included within the broad scope of unfair competition law are, among others, the independent causes of action of trade secret law and misappropriation.  *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App. - Waco 1993, writ denied), *superseded by statute on other grounds*, TEX. CIV. PRAC. & REM. CODE ANN. § 41.006, *as recognized by Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 224 (Tex. App. - Dallas 2005).  Unfair competition as it relates to trade secrets is applicable when the defendant attempts to "pass off" his products as the plaintiffs, thereby confusing the customers.  *Id.* Misappropriation, while also encompassed by the tort of unfair competition, involves an appropriation and use of the plaintiff's products in competition with the plaintiff.  *Id.*  DIT does not allege that Seastrunk has attempted to "pass off" his products as DIT's, but rather bases his unfair competition claim on the allegation that Seastrunk stole DIT products and used them to compete with DIT.

In order to show misappropriation, and thus unfair competition, the plaintiff must prove that he created a product through extensive time, labor, skill, and money, and the defendant used that product in competition with the plaintiff, giving the defendant a special advantage because it is not burdened by the expense of creating the product.  *Id.* at 218.  These actions must also result in commercial damage to the plaintiff.  *Id.*  DIT claims that it created Micore and LCI through extensive time, labor, skill and money, and that Seastrunk stole the products and used them in

competition with DIT. DIT has failed to prove this by a preponderance of the evidence. As previously discussed there is no evidence, only speculation, that Seastrunk stole the Micore and LCI products from DIT. The surveillance video is unclear, and two other employees that had recently been fired had the same access to the Micore and LCI products. There is also no evidence that Seastrunk used the Micore or LCI products at SMS. While SMS has a product that serves a similar purpose as Micore, there was no comparison of the products at trial, apart from how they are described in printed materials. Showing similar descriptions is not sufficient to show that SMS was using DIT's products. As a result the Court finds that DIT has not proven by a preponderance of the evidence that Seastrunk or SMS misappropriated the Micore and LCI products or used them to unfairly compete with DIT. Therefore, DIT is not entitled to injunctive relief, damages, or attorney fees on this claim.

### B. Misappropriation of Trade Secrets

For these reasons, DIT has also not shown that Seastrunk misappropriate trade secrets. "To establish misappropriation of a trade secret under Texas law, a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *Gala Tech., Inc. v. Recycled Products Corp.*, 175 F.3d 365, 376 (5th Cir. 1999); *General Universal Systems, Inc. V. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007). "A trade secret is any formula, pattern, device or compilation of information used in a business, which gives the *owner* an opportunity to obtain an advantage over his competitors who do not know or use it." *Id.* (citing *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994)). Because, DIT cannot show that Seastrunk ever acquired DIT trade secrets, DIT cannot succeed on its claim for misappropriation of trade

secrets. As discussed above, there is no evidence that Seastrunk ever took anything from DIT. Neither Shelia Darisse, nor Roger Darisse saw Seastrunk remove anything from the DIT office building. Moreover, the surveillance video showed an unrecognizable person entering and exiting the DIT offices several times on July 16, 2004. Apart from the speculation of Shelia Darisse, there was no evidence that Seastrunk was the person on the tape. In addition, even if it was Seastrunk on the video, the tape does not show what, if anything, he removed from the building. There is also not sufficient evidence that the products DIT claims were stolen were ever used by Seastrunk or SMS. Therefore, the Court finds that Seastrunk did not misappropriate trade secrets. DIT is not entitled to injunctive relief, damages, or attorney fees on this claim.

### C. Texas Theft Liability Act

DIT's claim under the Texas Theft Liability Act also fails. The Texas Theft Liability Act states that, "a person who commits theft is liable for damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). A person commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). The appropriation of property is unlawful if: "(1) it is without the owner's effective consent" or "(2) the property is stolen and the actor appropriates the property knowing it was stolen by another." *Id.* § 31.03(b). As already discussed, the evidence does not show that Seastrunk unlawfully appropriated any DIT property. Moreover, there is no indication that Seastrunk used property knowing that someone else had stolen it from DIT. While Shelia Darisse testified that there were items missing from DIT, no evidence supports the inference that the items were stolen. DIT has failed to prove by preponderance of the evidence that Seastrunk is liable under the Texas Theft Liability Act, and it is not entitled to damages or attorney fees on this claim.

### D. Conversion

Likewise, just as DIT is unable to prove that Seastrunk committed a theft, it is also unable to prove that Seastrunk is liable for Conversion. Conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of, or inconsistent with, owner's rights." *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 ( Tex. App. - San Antonio 1997); *Vibbert v. PAR, Inc.*, 224 S.W.3d 317, 321 (Tex. App. - El Paso 2006). In order to establish a claim for conversion, the plaintiff must prove (1) he "owned, had legal possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) plaintiff made demand for property; and (4) defendant refused to return property." *Ojeda*, 956 S.W.2d at 707; *Vibbert*, 224 S.W.3d at 321. DIT has failed to prove that Seastrunk wrongfully obtained and exercised control of DIT property. Therefore, DIT cannot prove its conversion claim. The Court finds that when Seastrunk's employment with DIT ended, Seastrunk only removed personal items. The fact that DIT inventoried its property after Seastrunk left DIT does not support the inference that Seastrunk took the missing items. DIT failed to prove that Seastrunk took and controlled DIT property without authorization. Therefore, Seastrunk is not liable for conversion. Accordingly, DIT is not entitled to damages or attorneys fees on this claim.

### CONCLUSION

Seastrunk failed to present sufficient evidence that DIT copied constituted elements of the Converter and the Decode. The evidence also does not show that DIT's code is substantially similar to the Converter or Decode. Likewise, DIT has failed to prove that Seastrunk infringed the

computer codes known as Micore and LCI.  The allegation that Seastrunk stole the Micore and LCI products was based on speculation, and there was no comparison of the code used by Seastrunk with the code used by DIT.

DIT's third party plaintiff claims and counter claims also fail.  First, DIT's claims for civil conspiracy, tortious interference with existing contracts, and breach of fiduciary duty are all based on the allegation that Seastrunk, together with Kennedy and Sisser, decided to form a business that competed with DIT, while they were still employed by DIT.  The evidence does not support this assertion.  Seastrunk never agreed to form a business that competed with DIT and cannot be held liable for the actions of Kennedy or Sisser.  Second, DIT's claims for unfair competition, misappropriation of trade secrets, Texas Theft Liability Act, and conversion fail because DIT cannot show that Seastrunk stole DIT property, or that stolen property was used by Seastrunk at SMS.

The case having been tried and issues duly decided, Seastrunk shall take nothing by way of his cause of action against DIT, and DIT shall take nothing by way of its causes of action against Seastrunk.

**SO ORDERED.**  March 28, 2008.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE